**UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF PENNSYLVANIA – PITTSBURGH DIVISION**

| | |
|---|---|
| JOSEPH A. BONDS, individually and on behalf of all others similarly situated, | ) ) C.A. No.:  2:13-cv-01217-TFM |
| | ) |
|     Plaintiffs, | ) |
| | ) *Electronically Filed* |
| v. | ) |
| | ) |
| GMS MINE REPAIR & MAINTENANCE, INC., | ) Jury Trial Demanded |
| | ) |
|     Defendant. | ) |
| _____ | ) |

**DEFENDANT'S RESPONSE IN OPPOSITION
TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION
PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 23**

## I.    INTRODUCTION

Plaintiff's predominant assertion in this case is that the defendant instituted a policy in April of 2012 requiring employees who drive to work to park in a remote parking area, ride a shuttle to the changing area, scheduled the last shuttle run at 30 minutes before the start of the assigned shift, thus compelling employees to arrive at work 30 minutes early.  Characterizing this as compensable "waiting time", Plaintiff asserts that the failure to pay employees for this time violates the Fair Labor Standards Act and the Pennsylvania Wage Payment and Collection Law.  Consistent with that central theory, plaintiff seeks certification of a class of all employees who were ostensibly subject to that policy, and, consequently, were compelled to arrive at work early, without compensation.  As defendant has set forth in in support of its Motion for Summary Judgment, the Supreme Court's recent decision in *Integrity Staffing Solutions, Inc. v. Busk*, 135 S.Ct. 513 (2014) is almost certainly dispositive of that theory, because such pre-shift time is clearly

"preliminary and not considered compensable work.  Given that, the Court plainly cannot certify a Rule 23 Class of all employees who were subject to the aforesaid policy.  That alone requires that Plaintiff's Motion for Class Certification be denied.

Aside from that, plaintiff has not otherwise demonstrated the significant requirements for class certification under Rule 23.  Discovery has shown that his claims and alleged damages and those of the other putative class members are not at all homogeneous, but rather, are highly individualized.  In an attempt to draw out similarities between himself and his fellow miners, Plaintiff alleges that all employees were subject to the same "policies."  However, all hourly employees in any workplace are typically subject to the same policies.  The question is not "what are the policies?" but instead is "what are the employees' allegedly compensable pre- and post-shift activities, and do they involve predominantly common factual issues and proof?"  Here, proof of the alleged class claims would require individualized inquiries as to the pre- and post-shift habits of each singular employee, which would in turn devolve into a series of mini-trials on liability and damages.  Thus, not only is the central employment policy of which plaintiff complains manifestly not unlawful under *Integrity Staffing*, but for all of these foregoing reasons, plaintiff has failed to meet the requirements set forth in Rule 23.  The motion for class certification should be denied.

## II.    STATEMENT OF FACTS

### A.    FACTS RELATING TO PLAINTIFF'S AND THE OPT-INS' EMPLOYMENT WITH GMS

GMS provides mine maintenance and contracting services, and has been engaged by Consol Energy to perform these services at the Enlow Fork Mine (the "Mine") in East Finley,

Pennsylvania.  *See* SOF ¶ 1.[1]  Plaintiffs are current and former employees of GMS who worked as underground miners at the Pleasant Grove Portal (the "Portal") of the Mine from February 1, 2012 to the present.  *See* SOF ¶ 2.

GMS miners are assigned to work one of three eight-hour shifts:  8:00 a.m. to 4:00 p.m., 4:00 p.m. to 12:00 a.m., or 12:00 a.m. to 8:00 a.m.  *See* SOF ¶ 3.  To perform their job duties, miners are carried underground by an elevator referred to as the "cage," which departs at the commencement of each shift.  *See* SOF ¶ 4.  Once underground, miners use conveyances called "mantrips," which take the miners to their respective working sections of the Mine.  *See* SOF ¶ 5. All underground mine workers reporting for work at the Portal must be dressed and ready to enter the Mine promptly at the start of their shifts; otherwise, they risk being left behind and missing a day of work.  *See* SOF ¶ 6.  To enter the Mine punctually at the start of their shifts, miners needed to leave sufficient time to dress, gather equipment, and don protective gear.  *See* SOF ¶ 7.

### B.      FACTS RELATING TO THE PARKING/SHUTTLE POLICY

As stated, plaintiffs' argument for class certification is founded upon an assertedly uniform company policy in effect during a period from April, 2012 through April, 2014 under which employees were required to park in a designated parking area some distance from the GMS portal and bathhouse, and ride a shuttle, which last departed 30 minutes or so before the start of shift. Plaintiffs first challenged this as compensable travel time, but in their Amended Complaint re characterized it as "waiting time".  In either event, they alleged it to be compensable under the FLSA, and the Pa. WPCL.  The facts relating to the "waiting/travel time" claim are as follows.

---

[1] "SOF ¶ _" refers to the numbered paragraphs of the previously filed Concise Statement of Undisputed Material Facts Supporting GMS's Motion for Summary Judgment.  *See* Dkt. No. 103.

At some point in 2012, GMS was informed by Consol Energy that due to limited space in the main parking lot at the Portal of the Mine, employees of Consol's contractors, such as GMS, would have to park in a satellite lot approximately one-quarter mile away from the Portal.  *See* SOF ¶ 9.  Because Consol prohibited anyone from walking across the parking lots to the Portal, GMS was instructed to provide transportation for its employees from the satellite parking lot to the Portal and back to the lot at the end of the workday.  *See* SOF ¶ 10.  To that end, in May, 2012, GMS purchased a ten-passenger van to shuttle its employees back and forth from the satellite parking lot to the Portal.  *See* SOF ¶ 11.  The van began running approximately one hour prior to the start of each shift, and initially, continued to run up until the start of the shift.  *See* SOF ¶ 12.  However, GMS later decided that the shuttle would stop running approximately 30 minutes prior to the start of each shift to ensure that the miners arrived at the Portal with adequate time to prepare for work prior to the start of their shifts.  *See* SOF ¶ 13.

Miners were not required to drive to work and park in the satellite lot.  *See* SOF ¶ 14. Instead, they could be dropped off at the Portal, or they could carpool to work with a Consol employee.  *See* SOF ¶ 15.  Only those employees who chose to drive to work were required to park in the satellite parking lot and ride the GMS van to the Portal.  *See* SOF ¶ 16.

On April 14, 2014, GMS was informed by Consol that, due to an expansion of the parking lot, its employees were permitted to park at the main parking lot again.  *See* SOF ¶ 17.  Thus, after April 14, 2014, GMS miners who elected to drive themselves to work were no longer restricted by the van schedule, and could once again arrive at work at whatever time they felt appropriate, provided that they were ready to enter the Mine promptly at the start of their shifts.  *See* SOF ¶ 18.

For the time period from 2012 until April of 2014 when access to the main parking lot was

restricted and the GMS van was in service, the record shows that plaintiff and the Opt-Ins spent varied amounts of time waiting, both before and after work, for the van.  For instance, while some miners testified that they waited only "a few minutes" to catch the van from the satellite lot to the Portal before the start of the workday, others reported pre-shift wait times of five to ten minutes. _See_ SOF ¶ 19.  Plaintiff and the Opt-Ins acknowledged similar variances in wait times at the conclusion of the workday, with some miners testifying that oftentimes there was no wait, and others reporting post-shift wait times ranging from five to 30 minutes.  _See_ SOF ¶ 20.

Although some putative collective action members testified that their pre-shift routines were altered by their inability to park in the main lot near the Portal, in that they had to arrive earlier to catch the GMS van, many others testified that their use of the GMS van had _no impact whatsoever_ on their arrival habits.  _See_ SOF ¶ 21.  The reason underlying this significant variance is simple – as long as plaintiff and the Opt-Ins were ready to cage down into the Mine and begin work by their scheduled start time, the precise time any particular miner chose to arrive at the jobsite was a matter of personal preference.  _See_ _id._  Each miner's daily post-shift wait time was also a function of personal choice.  Workers who elected to shower and change their clothes prior to leaving the worksite naturally waited longer, while those who chose to leave the site immediately upon exiting the Mine generally experienced little to no wait time at all.  _See_ SOF ¶ 22.

C.       **FACTS RELATING TO PLAINTIFFS' SAFETY MEETING TIME CLAIM**

The pre-shift safety meetings for which plaintiffs seek compensation were not formal, organized, prescribed "meetings."  Rather, given that employees who drove to work had to board the shuttle at or about 30 minutes before start of their shifts, they were routinely idling in and about

the entry portal before it opened.  GMS managers, supervisors, or crew leaders utilized that time

prior to the start time of the shifts to talk informally with whatever miners who happened to be

present about various safety issues, and the general plan for the workday.  The evidence shows

that these were impromptu discussions.  The informal pre-shift conversations generally lasted no

longer than five to ten minutes.  No roll call was taken, nor was any other record of attendance

generated.  _See_ SOF ¶ 23.  Miners were required to arrive at the Portal early, but were not otherwise

required to participate in any such pre-shift meetings or discussions.  Rather, they were simply

required to arrive early to begin working by the start time of their designated shift, and the waiting

time was simply utilized to "talk up safety".  _See_ SOF ¶ 24.  In contrast to these brief, ad hoc pre-

shift conversations, GMS conducted organized and regularly scheduled safety meetings with its

miners on a weekly basis.  These meetings occurred during the miners' compensable work time.

_See_ SOF ¶ 25.

The putative collective action members' experiences relative to the alleged pre-shift safety

meetings varied widely.  Some miners were unable to recall how frequently the claimed meetings

occurred, while others testified that they were either a daily or weekly occurrence.  _See_ SOF ¶ 26.

Plaintiff and the Opt-Ins also disagree over how long such meetings lasted.  _See_ SOF ¶ 27.  There

clearly is no evidence of any "policy" of scheduling and requiring attendance at any such pre-shift

meeting, as distinct from waiting time necessitated by the parking/shuttle policy.

### D.     FACTS RELATING TO PLAINTIFFS' DRUG TESTING TIME CLAIM

Because of the inherently dangerous nature of mining work, and in order to ensure a safe

working environment, GMS requires its miners to submit to random drug tests.  These drug tests

could occur either before or after the designated start and end times of Plaintiffs' assigned shifts.

*See* SOF ¶ 28.  Among those Opt-Ins who have provided deposition testimony in this action, many reported that they were *never* selected for a random drug test during the course of their employment with GMS.  *See* SOF ¶ 29.  Of those who did report that they were selected, the vast majority testified that they were tested *prior* to the start of their scheduled shift.  *See* SOF ¶ 30.  These pre-shift drug tests generally only took a few minutes, and in the event that the testing took longer and went past the Plaintiffs' scheduled start time, Plaintiffs were compensated for such time, beginning at the commencement of their scheduled shift.  *See* SOF ¶ 31.  Only two of the Plaintiffs who have provided testimony in this action claim that they were subject to post-shift random drug testing.  *See* SOF ¶ 32.

## III.   ARGUMENT

In addition to his Fair Labor Standards Act ("FLSA") claims, Plaintiff has brought state law wage claims under the Pennsylvania Minimum Wage Act ("MWA") and Wage Payment and Collection Law ("WPCL").  Both Plaintiff's state law claims and his FLSA claims are predicated upon the allegation that GMS failed to pay Plaintiff and other underground miners overtime compensation for certain pre- and post-shift activities.  Indeed, Plaintiff's state law claims are virtually identical to his FLSA claims.  The only meaningful difference is that Plaintiff can bring the MWA and WPCL claims by using the *opt-out* mechanism created by Federal Rule of Civil Procedure 23, whereas he cannot bring an FLSA claim using the Rule 23 class action device because the FLSA expressly precludes Plaintiff from exercising that option with its *opt-in* requirement.  *See* 29 U.S.C. § 216(b).  For the reasons set forth herein, Plaintiff's motion to certify the MWA and WPCL claims must be denied because he has failed to meet the standards for certifying a class under the framework set forth in Rule 23.

A.      STANDARD FOR RULE 23 CLASS CERTIFICATION

"The class action is 'an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only.'" _Comcast Corp. v. Behrend_, 133 S.Ct. 1426, 1432 (U.S. 2013) (quoting _Califano v. Yamasaki_, 442 U.S. 682, 700-701 (1979)).  "In order to justify a departure from that rule, 'a class representative must be part of the class and possess the same interest and suffer the same injury as the class members.'" _Wal-Mart Stores, Inc. v. Dukes_, 131 S.Ct. 2541, 2550 (U.S. 2011) (quoting, _inter alia_, _East Texas Motor Freight System, Inc. v. Rodriguez_, 431 U.S. 395, 403 (1977)).  To come within the exception, a party seeking to maintain a class action must "affirmatively demonstrate" his compliance with the principles and procedures governing class actions, which are clearly delineated in Federal Rule of Civil Procedure 23.  _Martin v. Ford Motor Co._, 292 F.R.D. 252, 264 (E.D. Pa. 2013).

Rule 23 sets forth a two-pronged standard for class certification.  The initial prerequisites are laid out in Rule 23(a), which reads as follows:

(a)      One or more members of a class may sue or be sued as representative parties on behalf of all members only if:

(1)      the class is so numerous that joinder of all members is impracticable;

(2)      there are questions of law or fact common to the class;

(3)      the claims or defenses of the representative parties are typical of the claims or defenses of the class; and

(4)      the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a).  Rule 23(a)'s requirements thus are often stated as "numerosity, commonality, typicality, and adequacy."

Thereafter, Rule 23(b) permits class actions under certain specified conditions, but only if

the action first satisfies each of Rule 23(a)'s four prerequisites.  *See Baby Neal v. Casey*, 43 F.3d 48, 55 (3d Cir. 1994) (explaining that to obtain class certification, a plaintiff must initially meet all four requisites of Rule 23(a) and then, at least one part of Rule 23(b)); *see also Newton v. Merrill Lynch, Pierce, Fenner & Smith*, 259 F.3d 154, 182 (3d Cir 2001); MANUAL FOR COMPLEX LITIGATION, FOURTH, § 21.131.  Under Rule 23(b):

> (b)      A class action may be maintained if Rule 23(a) is satisfied and if:
>
> > (1)      prosecuting separate actions by or against individual class members would create a risk of:
> >
> > > (A)      inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class; or
> > >
> > > (B)      adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests;
> >
> > (2)      the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole; or
> >
> > (3)      the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. The matters pertinent to these findings include:
> >
> > > (A)      the class members' interests in individually controlling the prosecution or defense of separate actions;
> > >
> > > (B)      the extent and nature of any litigation concerning the controversy already begun by or against class members;
> > >
> > > (C)      the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and

(D)     the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b).  Here, Plaintiff seeks certification under Rule 23(b)(3), which requires a showing of "predominance" and "superiority."  *See* *id.*

Importantly, "Rule 23 does not set forth a mere pleading standard."  *Dukes*, 131 S.Ct. at 2551.  Rather, ***the party seeking certification bears the burden of establishing each and every element of Rule 23 by a preponderance of the evidence***.  *See* *Marcus v. BMW of North America, LLC*, 687 F.3d 583, 591 (3d Cir. 2012).  A party's assurances to the court that it intends or plans to meet the requirements is insufficient, and thus it has been said that "[t]he evidence and arguments a district court considers in the class certification decision call for rigorous analysis."  *In re Hydrogen Peroxide Antitrust Litigation*, 552 F.3d 305, 318 (3d Cir. 2008).  Echoing the Supreme Court, the Third Circuit has repeatedly "emphasize[d] that '[a]ctual, not presumed[,] conformance' with Rule 23 requirements is essential."  *Id.* at 326 (quoting *Newton*, 259 F.3d at 167 (3d Cir. 2001) (quoting *Gen. Tel. Co. of the Sw. v. Falcon*, 457 U.S. 147, 160 (1982))).

To determine whether there is actual conformance with Rule 23, a district court must conduct a demanding exploration of the evidence and arguments put forth (*see* *Falcon*, 457 U.S. at 161), "delv[ing] beyond the pleadings to determine whether the requirements for class certification are satisfied."  *Newton*, 259 F.3d at 167; *see also* *Johnston v. HBO Film Mgmt., Inc.*, 265 F.3d 178, 189 (3d Cir. 2001).[2]  When doing so, "the court cannot be bashful.  It 'must resolve

---

[2] *See* 5 James Wm. Moore *et al.*, MOORE'S FEDERAL PRACTICE § 23.61[1] (3d ed. 2008) ("Pleading requirements are distinct from the requirements for certifying a case as a class action.  A court may not and should not certify a class action without a rigorous examination of the facts to determine if the certification requirements of Rule 23(a) and (b) have been met"); *Szabo v. Bridgeport Machs., Inc.*, 249 F.3d 672, 675 (7th Cir. 2001) ("The proposition that a district judge must accept all of the complaint's allegations when deciding whether to certify a class cannot be found in Rule

all factual or legal disputes relevant to class certification, even if they overlap with the merits.' Rule 23 gives no license to shy away from making factual findings that are necessary to determine whether the Rule's requirements have been met."  *Marcus*, 687 F.3d at 591 (quoting *In re Hydrogen Peroxide*, 552 F.3d at 317).  Failure to meet *any* of Rule 23(a) or 23(b)'s requirements precludes certification of a class.  *See Danvers Motor Co. v. Ford Motor Co.*, 543 F.3d 141, 147 (3d Cir. 2008).  Indeed, the Supreme Court has directed courts to "exercise caution" in class certification.  *See Amchem Prods. v. Windsor*, 521 U.S. 591, 597 (1997).

Finally, as alluded to immediately above, although as a general principle, a court is not permitted to engage in analysis of the merits in order to determine whether a class action may be maintained, the boundary between a class determination and the merits may not always be easily

---

23"); *see also Unger v. Amedisys Inc.*, 401 F.3d 316, 321 (5th Cir. 2005) ("The plain text of Rule 23 requires the court to 'find,' not merely assume, the facts favoring class certification"); *Gariety v. Grant Thornton, LLP*, 368 F.3d 356, 365 (4th Cir. 2004) ("If it were appropriate for a court simply to accept the allegations of a complaint at face value in making class action findings, every complaint asserting the requirements of Rule 23(a) and (b) would automatically lead to a certification order, frustrating the district court's responsibilities for taking a 'close look' at relevant matters, for conducting a 'rigorous analysis' of such matters, and for making 'findings' that the requirements of Rule 23 have been satisfied"); *Tardiff v. Knox County*, 365 F.3d 1, 4-5 (1st Cir. 2004) ("It is sometimes taken for granted that the complaint's allegations are necessarily controlling; but class action machinery is expensive and in our view a court has the power to test disputed premises early on if and when the class action would be proper on one premise but not another.").  In *Szabo*, the Court of Appeals for the Seventh Circuit offered this persuasive explanation:

> The reason why judges accept a complaint's factual allegations when ruling on motions to dismiss under Rule 12(b)(6) is that a motion to dismiss tests the legal sufficiency of a pleading.  Its factual sufficiency will be tested later – by a motion for summary judgment under Rule 56, and if necessary by trial.  By contrast, an order certifying a class usually is the district judge's last word on the subject; there is no later test of the decision's factual premises (and, if the case is settled, there could not be such an examination even if the district judge viewed the certification as provisional).

249 F.3d at 675-76.

discernible.  *See* *Retired Chi. Police Ass'n v. City of Chi.*, 7 F.3d 584, 598-99 (7th Cir. 1993).

Consequently, "[t]he class determination generally involves considerations that are enmeshed in

the factual and legal issues comprising the plaintiff's cause of action." *Mielo v. Bob Evans Farms,*

*Inc.*, No. 14-1036, 2015 U.S. Dist. LEXIS 36905, *9 (W.D. Pa. Mar. 23, 2015); *see also* *Dukes*,

131 S.Ct. at 2551 (class certification analysis "[f]requently … will entail some overlap with the

merits of the plaintiff's underlying claim").  Thus, the district courts "must resolve all factual or

legal disputes relevant to class certification, even if they overlap with the merits – including

disputes touching on elements of the cause of action." *Montgomery County v. Merscorp, Inc.*, 298

F.R.D. 202, 209 (E.D. Pa. 2014).

## B.    APPLICATION OF THE STANDARD

### 1.    Plaintiff's Motion for Class Certification Must Be Denied Because Plaintiff Has Not Met His Burden to Prove Actual  Conformance with Each of the Prerequisites of Rule 23(a)

#### a.    Plaintiff Has Failed to Prove Commonality under Rule 23(a)(2) Because There Are No Common Answers to Crucial Questions

The commonality requirement demands a showing that "there are questions of law or fact

common to the class."  Fed. R. Civ. P. 23(a)(2).  On its face, Rule 23(a)(2) seems relatively

straightforward; however, as the United States Supreme Court recently observed, the Rule "is easy

to misread, since "[a]ny competently crafted class complaint literally raises common 'questions.'"

*Dukes*, 131 S.Ct. at 2551 (quoting Nagareda, *Class Certification in the Age of Aggregate Proof*,

84 N.Y.U. L.Rev. 97, 131-132 (2009)).  Thus, merely raising common questions without

demonstrating the ability to generate common answers is insufficient to support class treatment.

As this Court recognized even before the Supreme Court clarified the commonality

requirement in *Dukes*, "[c]ommonality will not be found where the alleged common issues can

only be resolved by making factual determinations that will be different for each class member."

_Lewis v. Ford Motor Co._, 263 F.R.D. 252, 259 (W.D. Pa. 2009) (explaining that "[w]here the plaintiffs' 'proposed common questions are inherently individualized, requiring inquiry into the particular circumstances' of each plaintiff, courts have declined to certify the proposed class") (quoting _Holmes v. Pension Plan of Bethlehem Steel Corp._, No. 98-1241, 1999 U.S. Dist. LEXIS 10467, *20 (E.D. Pa. June 30, 1999)).

To be sure, reciting ostensibly common questions is **_not_** sufficient to obtain class certification. Rather, "[c]ommonality requires the plaintiff to demonstrate that the class members have suffered the same injury." _Dukes_, 131 S.Ct. at 2551. Critically, "**_[t]his does not mean merely that they have all suffered a violation of the same provision of law_**." _Id._ (emphasis supplied). What matters to class certification "is not the raising of common 'questions' – even in droves – but, rather the capacity of a classwide proceeding to generate **_common answers_** apt to drive the resolution of the litigation. Dissimilarities within the proposed class are what have the potential to impede the generation of common answers." _Id._ (quoting Nagareda, _supra_, at 132).

In _Dukes_, the plaintiffs offered statistical evidence, performed by a labor economist, which the Court found to be insufficient proof of the capacity of a classwide proceeding to generate common **_answers_** as to Wal-Mart's pay and promotion policies. _See id._ at 2555. By contrast, here, Plaintiff has offered **_no evidence_**, insufficient or otherwise, to support a finding of commonality. Instead, Plaintiff contends that he has demonstrated commonality simply because he and the putative class members he seeks to represent were subject to common employer "policies," wherein they were not compensated for time spent traveling between a satellite parking lot and the entrance to the GMS jobsite, waiting for company-supplied transportation between the parking lot

and the jobsite, attending pre-shift safety meetings, and submitting to off-shift random drug tests. Plaintiff then goes on to do exactly what the Supreme Court pronounced as inadequate in *Dukes*, by simply reciting a list of alleged common questions, including whether Plaintiff and proposed class members were entitled to compensation for the above-referenced preliminary and postliminary activities, and whether Plaintiff and proposed class members have sustained damages (and, if so, the proper measure of such damages).

Tellingly, however, Plaintiff makes no effort to identify how such questions could generate common ***answers***.   Plaintiff's failing in this regard either represents a fundamental misunderstanding of the commonality standard as articulated by the Supreme Court in *Dukes*, or, conversely, indicates an acknowledgement that common answers simply do not exist, where the record amassed in this action plainly demonstrates that the facts and circumstances surrounding the alleged pre-and post-shift activities of Plaintiff and the putative class members varied vastly and materially across the group.

For instance, with regard to Plaintiff's proposed common question on the issue of damages, as it relates to Plaintiff's travel/waiting time claim, the record shows that Plaintiff and his fellow miners spent varied amounts of time waiting, both before and after work, for the GMS van.  *See* SOF ¶¶ 19-20.  Likewise, while some putative class members testified that their pre-shift routines were, to varying degrees, altered by their inability to park in the main lot near the Portal, many others testified that their use of the GMS van had no impact whatsoever on their arrival habits. *See* SOF ¶ 21.  Thus, in order to assess the existence of claims and/or the proper measure of damages, the Court will be forced to conduct an individualized analysis of each employee's pre- and post-shift activities, which fluctuate not only from individual to individual, but also, for any

one employee, from one workday to the next.  Similar individualized evaluations will be required to ascertain the existence of claims and computation of damages for Plaintiff's safety meeting and drug testing time claims, as the record establishes that the putative class members' experiences relative to the alleged pre-shift safety meetings varied widely (*see* SOF ¶¶ 26-27), as did their experiences relative to GMS's random drug tests.  *See* SOF ¶¶ 29-32.

In sum, numerous individualized inquiries prevent certification; moreover, Plaintiff has entirely failed to show that a classwide proceeding could "generate common ***answers*** apt to drive the resolution of the litigation."  *Dukes*, 131 S.Ct. at 2551 (emphasis in original).  Commonality is therefore lacking, and Plaintiff's motion for class certification must be denied.

> **b.     Plaintiff Has Failed to Prove Typicality under Rule 23(a)(3) Plaintiff's Claims Are Not Typical of the Class He Seeks to Represent**

Rule 23 also requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class."  Fed. R. Civ. P. 23(a)(3).  This requirement "is said to limit the class claims to those fairly encompassed by the named plaintiff's claims."  *Schwartz v. Avis Rent a Car Sys., LLC*, No. 11-4052, 2014 U.S. Dist. LEXIS 121322, *40 (D.N.J. Aug. 28, 2014) (citing *General Tel. Co. v. EEOC*, 446 U.S. 318, 330 (1980)).  Thus, in contrast to the commonality prong of the Rule 23(a)(2) test, which evaluates the sufficiency of the class, the typicality prong evaluates the sufficiency of the named plaintiff.  *See Mielo*, 2015 U.S. Dist. LEXIS 36905, *20 (citing *Baby Neal*, 43 F.3d at 56).

In the case *sub judice*, Plaintiff has failed to make the requisite showing that his claims are typical of those of the proposed class members.  In support of a finding of typicality, Plaintiff again offers no affirmative evidence whatsoever, instead relying on the bald and conclusory assertion

that "[b]ecause Bonds asserts the same wage and hour violations as other putative class members, his claims are typical of the class."  (Plaintiff's Memorandum [Dkt. No. 100] at 13).  However, the fact that claims arise from same course of conduct and are based on the same legal theory cannot be dispositive on the typicality issue; courts must reject class treatment when there is insufficient factual identity between class representative and class members.  *See* *Open Hous. Ctr. v. Samson Mgmt. Corp.*, 152 F.R.D. 472, 477 (S.D.N.Y. 1993); *see also* *W. Va. ex rel. Miller v. Sec'y of Educ. of the U.S.*, No. 90-590, 1993 U.S. Dist. LEXIS 21394, *28 (S.D. W. Va. Sept. 30, 1993) ("while it is a necessary element of the typicality requirement that all class members have the same legal theory, that fact standing alone is insufficient to satisfy typicality"); *Spencer v. Central States, Southeast & Southwest Areas Pension Fund*, 778 F.Supp. 985, 990 (N.D. Ill. 1991) (same).  Thus, a plaintiff cannot establish that his claims are typical simply by relying on the presence of state law wage claims; otherwise, all wage and hour litigation would be "typical."

Here, the evidence of record mandates the conclusion that Plaintiff's claims are ***not*** typical of the class he seeks to represent.  For instance, with respect to his claim related to compensation for drug testing time, Plaintiff testified that he was subject to a lengthy post-shift drug test on at least one occasion.  *See* SOF ¶ 32.  In contrast, most of the prospective class members who have provided deposition testimony in this action, *i.e.*, the representative sample FLSA Opt-In Plaintiffs, reported that they were ***never*** selected for a random drug test during the course of their employment with GMS.  *See* SOF ¶ 29.  Of those who did report that they were selected, the vast majority testified that they were tested *prior* to the start of their scheduled shift, and that *they were compensated for such time*.  *See* SOF ¶¶ 30-31.  Similarly, while Plaintiff testified that he generally only waited "a couple of minutes" to catch the GMS van from the satellite lot to the Portal before

the start of the workday (*see* SOF ¶ 19), making his claim susceptible to GMS's *de minimis* defense, other putative class members testified to substantially longer wait times.  *See id.* Likewise, while Plaintiff's use of the GMS van had little to no impact on his arrival habits (*see* SOF ¶ 21), other prospective class members indicated that their pre-shift routines were altered by their inability to park in the main lot near the Portal, in that they had to arrive earlier to catch the GMS van.  *See id.*  Not surprisingly, the same lack of typicality is looms with respect to Plaintiff's wage claim relating to time spent at so-called safety meetings.  *See* SOF ¶ 23.  Thus, as with commonality, the weight of the evidence adduced in this matter compels a finding that the typicality requirement of Rule 23(a)(3) has not been met.  Plaintiff's motion for class certification must therefore be denied.

> **2.      Plaintiff's Motion for Class Certification Must Be Denied Because Plaintiff Has Not Met His Burden to Show Actual  Conformance with Each of the Prerequisites of Rule 23(b)(3)**

> **a.      Plaintiff Has Failed to Prove Predominance under Rule 23(b)(3) Because Common Questions and Answers Do Not Predominate Over Questions Affecting Individual Members**

Under Rule 23(b)(3), to certify a class, the Court must find that "questions of law or fact common to class members predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3).  Rule 23(b)(3) predominance is similar to Rule 23(a)(2) commonality, but Rule 23(b)(3)'s predominance requirement is "far more demanding." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623-34 (1997); *see also Churchill v. CIGNA Corp.*, No. 10-6911, 2012 U.S. Dist. LEXIS 117794, *32 (E.D. Pa. Aug. 21, 2012).  To satisfy this requirement, common answers to common questions must not only exist, but must also predominate any necessary individualized inquiries.  *See Comcast Corp. v. Behrend*, 133 S.Ct. 1426 (U.S. 2013).

Moreover, for the predominance requirement to be met, damages must be susceptible to measurement across the entire class, and individual damage calculations cannot overwhelm questions common to the class.  In *Comcast*, the Supreme Court recently held that questions of individual damage calculations preclude a finding that common issues predominate over individual ones.  *See id.*, 133 S.Ct. at 1432-33; *see also Jarosz v. St. Mary Med. Ctr.*, No. 10-3330, 2014 U.S. Dist. LEXIS 133218, \*30-32 (E.D. Pa. Sept. 22, 2014) (denying plaintiff's motion for certification of a Pennsylvania state class, reasoning that differences among the potential class members as to damages presented individualized inquiries, preventing a finding that common issues predominated); *Slapikas v. First Am. Title Ins. Co.*, No. 06-0084, 2014 U.S. Dist. LEXIS 83323, \*16-17 (W.D. Pa. June 19, 2014) (Conti, J.) (concluding that plaintiffs' claims were incompatible with Rule 23 and are not entitled to class treatment, reasoning that "individualized fact-finding will also be required to determine damages across the class, which is incompatible with *Comcast's* requirement that plaintiffs provide a system for finding damages that does not include individual fact-finding.  Certifying a class for which damages cannot be proven on a class wide basis is inefficient and improper. …  Questions of individual damage calculations will inevitably overwhelm questions common to the class") (citing *In re Community Bank of Northern Virginia*, 418 F.3d 277, 303 (3d Cir. 2005)); *Piemonte v. Viking Range, LLC*, No. 14-124, 2015 U.S. Dist. LEXIS 15154, \*10 (D.N.J. Feb. 9, 2015) (citing *Bright v. Asset Acceptance, LLC*, 292 F.R.D. 190, 203 (D.N.J. 2013) (explaining that the "Supreme Court's recent opinion in *Behrend* is clear that a plaintiff seeking class certification must present a reliable method for calculating damages on a class-wide basis")); *Wilson v. Consolidated Rail Corp. (In re Paulsboro Derailment Cases)*, Nos. 13-784, 12-7586, 12-7648, 13-410, 13-721, 13-761, 2014 U.S. Dist. LEXIS 115542, \*43 (D.N.J.

Aug. 20, 2014) (explaining that individual damages issues preclude certification under Rule 23(b)(3) because "[a]t the certification stage, the court must be assured that the determination of whether the defendant's conduct caused injury to each class member can be made at the class level").

Here, there is no question that individualized fact finding will be required to determine damages across the class, which is completely incompatible with _Comcast's_ requirement that Plaintiff provide a system for finding damages that does not include individual fact finding. Each putative class member in this action will need to present individual facts specifying his pre-and post-shift activities, and the duration of those activities, on a day-by-day basis, and the corresponding overtime compensation allegedly due. There will be the need to perform a fact-specific inquiry into each employee's daily work shift to find the value of each class member's damages. Ultimately, this review will require the court to parse out particularized details, and individual issues will therefore predominate over questions common to the class. Before _Wal-Mart_ and _Comcast_ "the case law was far more accommodating to class certification." _In re Rail Freight Fuel Surcharge Antitrust Litig._, 725 F.3d 244, 255 (D.C. Cir. 2013). In the wake of those decisions, however, Rule 23 requires a harder look at issues such as commonality and predominance.

Additionally, GMS has asserted as a defense that the time Plaintiff and class members spent on the alleged pre- and post-shift activities was _de minimis_. As a general rule, employees cannot recover for otherwise compensable time if it is _de minimis_. _See De Asencio v. Tyson Foods, Inc._, 500 F.3d 361, 374 (3d Cir. 2007) ("In recording working time under the Act, insubstantial or insignificant periods of time beyond the scheduled working hours, which cannot as a practical

administrative matter be precisely recorded for payroll purposes, may be disregarded") (quoting 29 C.F.R. § 785.47); *see also Barvinchak v. Ind. Reg'l Med. Ctr.*, No. 06-69, 2007 U.S. Dist. LEXIS 72805, *48 (W.D. Pa. Sept. 28, 2007).  Thus, even if the Court finds that the time Plaintiff and class members spent waiting for and riding the GMS van, attending pre-shift meetings, and submitting to drug tests constituted compensable work time,  GMS was entitled to disregard that time if it can demonstrate that it was *de minimis*.

Significantly, the *de minimis* defense goes to ***liability***, not damages.  See *Hawkins v. Securitas Sec. Servs. USA, Inc.*, 280 F.R.D. 388, 400-01 (N.D. Ill. 2011).  GMS's *de minimis* defense requires individualized inquiries which will predominate common issues.  To address that defense, the Court will need to assess any time each individual class member spent waiting for employer-supplied transportation to and from the satellite parking lot, submitting to post-shift drug tests, and attending so-called pre-shift safety meetings, as well as the aggregate amount of this time.  *See Alvarado v. Costco Wholesale Corp.*, No. 06-4015, 2008 U.S. Dist. LEXIS 48935, *13 (N.D. Cal. June 18, 2008) ("the amount of time, aggregate uncompensated time and the administrative difficulties in recording the small amounts of time spent in compliance with Costco's security measures, renders [the] wage claim *de minimis*").  Here, Plaintiff and the representative sample class members testified that alleged wait, drug test, and meeting times – when they occurred – varied significantly.  A jury could not apply the *de minimis* defense without first examining each member's entire testimony, which it would have to do while simultaneously assessing that individual's credibility. This is not a job for representative testimony.  *See Smith v. T-Mobile USA, Inc.*, No. 05-5274, 2007 U.S. Dist. LEXIS 60729, *23-24 (C.D. Cal. Aug. 15, 2007) (noting that the *de minimis* defense is individualized "by [its] nature").

For these reasons, class treatment is inappropriate because individualized issues relating to damages and defenses clearly predominate over any issues common to the proposed class. Plaintiff's certification motion should therefore be denied.

> **b.**     **Plaintiff Has Failed to Prove Superiority under Rule 23(b)(3) Common Questions and Answers Do Not Predominate Over Questions Affecting Individual Members**

Plaintiff does not explain how this case can be tried fairly or address the procedural considerations of a class action.  Instead, he contends that a class action is superior merely because "no individual plaintiff is likely to have the means or incentive to pursue this litigation on his or her own."  (Plaintiff's Memorandum [Dkt. No. 100] at 17).  However, to obtain certification and try the Pennsylvania wage claims as a class, Plaintiff must propose a viable method by which the Court can determine the damages GMS is actually obligated to pay each class member.  The Supreme Court's opinion in _Dukes_ makes clear that this cannot be achieved at the expense of precision or of actual proof of an individual class member's legal right to a damages award.  In rejecting a "trial by formula" to determine a putative class's backpay award, the Court held that a defendant is entitled to an individualized determination of the remedy to which each class member is entitled.  _See_ _Dukes_, 131 S.Ct. at 2561.  It reasoned that the Rules Enabling Act forbids interpreting Rule 23 to "abridge, enlarge or modify any substantive right."  _Id._ (quoting 28 U.S.C. § 2072(b)).

Here, there is no classwide method of determining whether, how often, and for how long class members actually experienced unpaid pre- and post-shift time.  As such, liability cannot be proved on a classwide basis without thwarting GMS's ability to demonstrate that some class members, due to a variety of circumstances, did not actually experience unpaid time despite being

subject to the alleged "policies" at issue in this action.

In light of all the foregoing, Plaintiff cannot credibly claim that a class action is the best available method for the fair and efficient adjudication of this controversy.  The mini-trials necessary to determine the membership of the class would be burdensome and endlessly wasteful. Every employee for which Plaintiff fails to establish liability or damages would be an inefficiency caused by class certification, and these inefficiencies would swamp the Court.  Thus, certification would promote neither fairness nor justice, and Plaintiff's motion for certification must be denied.

### c.     Plaintiff Has Also Failed To Identify an Ascertainable Class Based on Objective Criteria

In addition to predominance and superiority, the Third Circuit has increasingly emphasized the importance of ascertainability with respect to classes certified under Rule 23(b)(3).  *See, e.g., Carrera v. Bayer Corp.*, 727 F.3d 300, 305-08 (3d Cir. 2013); *Hayes v. Wal-Mart Stores, Inc.*, 725 F.3d 349, 354-56 (3d Cir. 2013); *Marcus v. BMW of N. Am., LLC*, 687 F.3d 583, 592-94 (3d Cir. 2012).[3]  Beginning in *Marcus*, the Third Circuit recognized that "an essential prerequisite of a class action, at least with respect to actions [brought] under Rule 23(b)(3), is that the class must be currently and readily ascertainable based on objective criteria."  *Marcus*, 687 F.3d at 592-93; *see also Hayes*, 725 F.3d at 355 ("As 'an essential prerequisite' to class certification ... plaintiff must show by a preponderance of the evidence that the class is ascertainable.") (citations omitted); *Carrera*, 727 F.3d at 306 ("a plaintiff must show, by a preponderance of the evidence, that the class is 'currently and readily ascertainable based on objective criteria,' and a trial court must undertake a rigorous analysis of the evidence to determine if the standard is met.") (citations

---

[3] In each of these cases, the district court's order certifying the class was vacated on appeal with respect to the ascertainability issue and remanded for further proceedings.

omitted).

The Third Circuit has determined that several important objectives are served by virtue of the ascertainability requirement for Rule 23(b)(3) class actions: (1) the requirement "eliminates 'serious administrative burdens that are incongruous with the efficiencies expected in a class action' by insisting on the easy identification of class members[;]" (2) the requirement "protects absent class members by facilitating the 'best notice practicable' under Rule 23(c)(2)[;]" and (3) the requirement "protects defendants by ensuring that those persons who will be bound by the final judgment are clearly identifiable." _Marcus_, 687 F.3d at 593; _see also_ _Hayes_, 725 F.3d at 355.

Ascertainability thus consists of "two important elements": (1) "the class must be defined with reference to objective criteria[;]" and (2) "there must be a reliable and administratively feasible mechanism for determining whether putative class members fall within the class definition."[4] _Hayes_, 725 F.3d at 355 (citing _Marcus_, 687 F.3d at 593-94). Ascertainability necessitates an inquiry into "whether the defendants' records can ascertain class members, and if not, whether there is a reliable, administratively feasible alternative."[5] _Id._ at 594. The Third

---

[4] At least one commentator has observed that "[a]dministrative feasibility means that identifying class members is a manageable process that does not require much, if any, individual factual inquiry." _Hayes_, 725 F.3d at 355 (citing William B. Rubenstein, Newberg on Class Actions § 3:3 (5th ed. 2011)).

[5] In _Hayes_, the district court "did not see [the defendant's lack of records identifying potential class members] as a barrier to class certification, reasoning that plaintiff should not be hindered from bringing a class action because defendant lacked certain records." 725 F.3d at 355. The Third Circuit, however, reached the opposite conclusion, explaining that "the nature or thoroughness of a defendant's recordkeeping does not alter the plaintiff's burden to fulfill Rule 23's requirements." _Id._ at 356. Therefore, in circumstances where a defendant "lacks records that are necessary to ascertain the class ... plaintiff must offer some reliable and administratively feasible alternative that would permit the court to determine" which individuals fit the definition of the class. _Id._; _see id._ ("Rule 23's requirements that the class be administratively feasible to ascertain and sufficiently numerous to warrant class action treatment cannot be relaxed or adjusted on the basis of [plaintiff's] assertion that [defendant's] records are of no help to him.").

Circuit has made clear that where "class members are impossible to identify without extensive and individualized fact-finding or 'mini-trials,' then a class action is inappropriate." *Marcus*, 687 F.3d at 593.

When considering a plaintiff's proposed mechanism for ascertaining the class, the Third Circuit has cautioned "against approving a method that would amount to no more than ascertaining by potential class members' say so[,]" by, for example, "having potential class members submit affidavits" that they meet the class definition. *Marcus*, 687 F.3d at 594. Without "further indicia of reliability," permitting such a method would essentially force defendants "to accept as true absent persons' declarations that they are members of the class," raising "serious due process implications." *Id.* A "petition for class certification will founder if the only proof of class membership is the say-so of putative class members or if ascertaining the class requires extensive and individualized fact-finding." *Hayes*, 725 F.3d at 356.

Here, Plaintiff's proposed class consists of "all current and former non-exempt employees of GMS who were assigned to work at the Pleasant Grove Portal of the Enlow Fork Mine from April 27, 2012 until April 14, 2014." (Plaintiff's Memorandum [Dkt. No. 100] at 1). This broadly defined class is warranted, according to Plaintiff, based on his claim that each employee in the proposed class was subject to the same policies, and had to perform pre- and post-shift activities for which they were not paid. Given the basic factual background in this matter, this definition does not satisfy the ascertainability requirement because it would require the Court to resolve the merits of each employee's claim against GMS.

First, there is no evidence that GMS's entire workforce engaged in the same or similar preliminary or postliminary activities as Plaintiff. To the contrary, and as discussed, while Plaintiff

testified that his use of the GMS van had little to no impact on his arrival habits (*see* SOF ¶ 21), other prospective class members indicated that their pre-shift routines were altered by their inability to park in the main lot near the Portal, in that they had to arrive earlier to catch the GMS van. *See id.* Moreover, while Plaintiff testified that he was subject to a lengthy post-shift drug test on at least one occasion (*see* SOF ¶ 32), most of the prospective class members who have provided deposition testimony in this action, reported that they were **never** selected for a random drug test during the course of their employment with GMS. *See* SOF ¶ 29. Plaintiff has not even attempted to address these differences, let alone prove how his personal and particular pre- and post-shift activities are applicable to the entire proposed class. Accordingly, Plaintiff has not carried his burden to establish an ascertainable class with respect to pre- and post-shift "work."

Exploration of the *de minimis* doctrine with respect to each employee also counsels against finding an ascertainable class. Examining the *de minimis* doctrine with respect to each employee's alleged pre and post shift activities, as well as the ultimate effect of GMS's "policies" on the proposed class members' arrival and departure habits, will require individual merits determinations for each potential class member. There is no other way to resolve these issues for each class member, and Plaintiff has failed to demonstrate otherwise. Accordingly, the *de minimis* defense, which looms large in this case, precludes a finding of an ascertainable, or otherwise manageable, class in this case. *See* <u>Briggins v. Elwood TRI, Inc.</u>, 882 F.Supp.2d 1256, 1276 (N.D. Ala. 2012) (with respect to *de minimis* defense, stating, "[t]his court cannot discern how the plaintiffs will proceed in this case in a way does not unduly prejudice the defendants without the case devolving into mini-trials for each plaintiff"). Plaintiff's motion to certify his state law claims must therefore be denied.

## IV.    <u>CONCLUSION</u>

For the above stated reasons, Plaintiff has failed to support with record evidence the certification of a Rule 23 class action, and therefore, the Court should deny Plaintiff s motion for class certification.

Respectfully submitted,

Date:  <u>July 2, 2015</u>                          By:    <u>/s/ Sunshine Fellows</u>
                                                            Avrum Levicoff, Esquire
                                                            Pa. I.D. #:  26044
                                                            ALevicoff@LevicoffLaw.com
                                                            Sunshine R. Fellows, Esquire
                                                            Pa. I.D. #: 87632
                                                            SFellows@LevicoffLaw.com
                                                            The Levicoff Law Firm, P.C.
                                                            Centre City Tower, Suite 1900
                                                            650 Smithfield Street
                                                            Pittsburgh, PA  15222
                                                            412-434-5200

                                                            *Counsel for Defendant,*
                                                            *GMS Mine Repair & Maintenance, Inc.*

**UNITED STATES DISTRICT COURT FOR THE**
**WESTERN DISTRICT OF PENNSYLVANIA – PITTSBURGH DIVISION**

| | |
|---|---|
| JOSEPH A. BONDS, individually and on behalf of all others similarly situated,<br><br>          Plaintiffs,<br><br>   v.<br><br>GMS MINE REPAIR & MAINTENANCE, INC.,<br><br>        Defendant. | C.A. No.:  2:13-cv-01217-TFM<br><br>The Hon. Terrance F. McVerry<br><br>Electronic Filing |
| JOSEPH A. BONDS,<br><br>        Plaintiff,<br><br>   v.<br><br>GMS MINE REPAIR & MAINTENANCE, INC.,<br><br>        Defendant. | C.A. No.:  2:13-cv-01480-TFM<br><br>(Consolidated with 2:13-cv-01217-TFM)<br><br><br><br><br><br>**Jury Trial Demanded** |

**CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing ***Defendant's Response in Opposition to Plaintiff's Motion for Class Certification Pursuant to Federal Rule of Civil Procedure 23*** with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following CM/ECF participants:

Larry A. Weisberg, Esquire
lweisberg@mwcfirm.com
Derek Cummings, Esquire
dwcummings@verizon.net
McCarthy Weisberg Cummings, P.C.
2041 Herr Street
Harrisburg, PA  17103

Date: <u>July 2, 2015</u>        By:   <u>  /s/ Sunshine Fellows  </u>
                              Avrum Levicoff, Esquire
                              Pa. I.D. #:  26044
                              ALevicoff@LevicoffLaw.com
                              Sunshine R. Fellows, Esquire
                              Pa. I.D. #: 87632
                              SFellows@LevicoffLaw.com
                              The Levicoff Law Firm, P.C.
                              Centre City Tower, Suite 1900
                              650 Smithfield Street
                              Pittsburgh, PA  15222
                              412-434-5200

                              *Counsel for Defendant,*
                              *GMS Mine Repair & Maintenance, Inc.*