**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **JOSEPH A. BONDS**, *individually and on behalf of all others similarly situated*, | ) ) ) |
| **Plaintiffs,** | ) **2:13-cv-1217** ) **(Lead Action)** |
| **v.** | ) ) |
| **GMS MINE REPAIR & MAINTENANCE, INC.,** | ) ) ) |
| **Defendant.** | ) ) |

<u>**MEMORANDUM OPINION AND ORDER OF COURT**</u>

Pending before the Court are a MOTION FOR CLASS CERTIFICATION PURSUANT

TO FED. R. CIV. P. 23 (ECF No. 99) filed by Plaintiff Joseph A. Bonds, individually and on

behalf of all others similarly situated; a MOTION FOR SUMMARY JUDGMENT (ECF No.

102) filed by Defendant GMS Mine Repair and Maintenance, Inc. ("GMS"); and a MOTION

FOR DECERTIFICATION OF CONDITIONALLY CERTIFIED COLLECTIVE ACTION

(ECF No. 106) filed by GMS.   The issues have been fully briefed by the parties in their

memoranda (ECF Nos. 100, 105, 110, 111, 112, 116, 117, 120, 121, 122), and the factual record

has been thoroughly developed through their Concise Statement of Material Facts ("CSMF"),

Responsive Statement of Facts ("RSOF"), appendices, and exhibits (ECF Nos. 103, 104, 114).

Accordingly, the motions are ripe for disposition.

### I.      Background

The following background is taken from the Court's independent review of the motions

of the parties, the filings in support and opposition thereto, and the record as a whole.

### A.  Factual Background[1]

GMS is a private company that provides mine maintenance and contracting services throughout the United States, including at the Enlow Fork Mine (the "Mine"), owned and operated by Consol Energy, Inc. in East Finley, Pennsylvania.  Mike Thomas is the General Manger, Louis Michael Fleece is the PA regional manager, and Robert ("B.J.") Gales is the site coordinator at the Mine.

Plaintiffs are current and/or former employees of GMS who were assigned to work as underground miners at the Pleasant Grove Portal (the "Portal") of the Mine from February 1, 2012 to the present.  GMS miners are assigned to work one of three eight-hour shifts: 8:00 a.m. – 4:00 p.m.; 4:00 p.m. – 12:00 a.m.; or 12:00 a.m. – 8:00 a.m.  Each shift worker was paid for eight (8) hours.  All underground mine workers reporting for work at the Portal must be dressed and ready to enter the Mine promptly at the start of the shifts, or else they risk being left behind and missing a day of work.[2]  Miners thus typically arrive early to dress, gather equipment, and don protective gear, and they may do so in a bathhouse / locker-room located next to the Portal.

GMS allegedly requires its employees to attend a fifteen-minute pre-shift safety meeting (the parties dispute this fact).  The description(s) of these purported meetings are wide-ranging: for instance, Fleece labels them "safety talks" that last just a few minutes, Dep. of Fleece at 7-9 9, Pls.' Ex. A, and Gales refers to them as brief ("a few seconds") and informal discussions (a "talk up," a "run-through," "just general conversation passing through") that he directs his

---

1.  The United States Court of Appeals for the Third Circuit has noted that the certification analysis does not require a court to recite the facts as set forth by the plaintiff(s).  *See Zavala v. Wal Mart Stores Inc.,* 691 F.3d 527, 538 n.7 (3d Cir. 2012).  At the same time, this Court must draw all reasonable inferences in favor of the nonmoving party in ruling on a motion for summary judgment, and therefore, the Court will set forth the facts in the light most favorable to Plaintiffs.

2.  At least one Opt-in Plaintiff testified, however, that the cage makes multiple trips at the start of each shift.  *See* Dep. of Opt-in Gasper Golden at 8, Def.'s Ex. 4 ("You really don't miss it [the cage], because I think that [it] can only fit, I think, 30 -- or, no maybe 30 some people at a time, so it always comes back up.").

subordinates (a shift foreman, one of three safety foreman, or a safety supervisor) to conduct if miners are standing around/lingering in the bathhouse before their shift actually commences, Dep. of Gales at 9-14, Pls.' Ex. B. The Declarations of twenty-four (24) GMS employees reflect a different story, which describe the pre-shift safety meetings as mandatory, almost daily occurrences that lasted fifteen minutes or so for which they were not compensated and subjected to discipline if they did not attend.[3] Either way, GMS also conducted organized and regularly scheduled safety meetings with its miners on a weekly basis.[4]

---

3. The Declarations were submitted by Brian W. Abel, Jason A. Anderson, Shane A. Baker, Joseph D. Balog, Justin Berswinger, Caleb A. Caldwell, Roddrus R. Clay, James W. Conrad, Derek Coss, Rodney Cunningham, Cody Dice, Jonathan G. DiMartino, Danny Q. Eddy, Christopher M. Glass, Gasper Golden, Wesley C. Harris, Bryan J. Hryniewich, John Jett III, Matthew C. Kulpa, William J. Nixon, John D. Ronto, Christopher P. Rose, Ryan C. Rubeis and Adam Thompson, and each of which state, in relevant part, as follows:

> 5.   As a mine worker, myself and other Enlow Employees were required to attend pre-shift safety meetings before entering the mine.

> 6.   These pre-shift safety meetings were held at the GMS trailer located at the Pleasant Grove Portal (entry point).

> 7.   These pre-shift safety meetings were held on an almost daily basis beginning approximately fifteen (15) minutes before each shift start time.

> 8.   Attendance at these pre-shift safety meetings was mandatory, and myself and other Enlow Employees were subject to discipline for failure to attend.

> 9.   During these pre-shift safety meetings, GMS crew leaders were responsible for confirming the attendance of myself and other Enlow Employees.

> 10.  During these pre-shift safety meetings, GMS crew leaders would instruct myself and other Enlow Employees on various safety issues and concerns within the mine environment and inform us of the work duties to be performed during the upcoming shift.

> 11.  During my employment with GMS as a mine worker, myself and other Enlow Employees were not compensated for attendance at these pre-shift safety meetings.

Pls.' Ex. C. Some of the sworn affidavits of the Opt-in Plaintiffs are inconsistent with their earlier deposition testimony given under oath. *See, e.g.*, Dep. of Opt-in Cody Dice at 17, Def.'s Ex. 3 ("Q. And did they ever have any sort of sign-in sheet to keep track of who was in attendance at those meetings?  A. I Don't think so, no."); Dep. of Opt-in Gasper Golden at 16, Def.'s Ex. 4 ("Q. Would they do like a sign-in sheet or anything to keep track of attendance?  A. No."); Dep. of Opt-in Bryan J. Hryniewich at 6-7, Def.'s Ex. 6 ("Q. Okay.  Did you ever have meetings with Mr. Gales or any other crew leaders or safety people before you went down in the morning?  A. Hardly ever B.J.  Different bosses at Consol sometimes, yeah.  Q. And that would be before you caged down at 8:00, like in the bath house?  A. Not typically. My crew -- my crew leader, when I got onto that crew, was a gentleman named Jack Lawrence. He was kind of the man that would take care of all of our -- knew where we were going, what we were doing."); Dep. of Opt-in Jason A. Anderson at 12, Def.'s Ex. 11 ("Q. Do you remember how long

Nevertheless, at the start of their scheduled shift, miners are carried underground by an elevator referred to as the "cage." Once underground, miners use conveyances called "mantrips," which transport them to their respective working sections of the Mine. The miners do not "cage up" unless they become sick, needed to resupply, or in the event of an emergency. Otherwise, they remain underground for their entire shift.

The primary job duties of the miners differ slightly – constructing (ventilation) walls, building track, masonry, spraying walls, gopher drilling, longwall set up/recovery – but (nearly) all of the work for which they were employed was performed underground.[5] The job titles of the

---

those meetings took, both the ones above ground and the ones underground? A. Like, five minutes."); Dep. of Opt-in Caleb Caldwell at 11-12, Def.'s Ex. 12 ("And you testified that they would happen at least once a week, but it's your testimony that they weren't daily meetings? A. No they weren't daily meetings. Q. Okay. And then how would you learn that there was going to be a safety meeting? A. They would tell us while we were getting ready."). 4. Plaintiffs contend that "[t]his statement does not represent a fair summary of the record and [it] is therefore DENIED." Pls.' RSOF at 4, ECF No. 114. In the reminder of that paragraph, Plaintiffs state as follows: "[i]t is admitted that GMS conducted organized and regularly scheduled safety meetings; however, to the extent that this statement implies that these regularly scheduled safety meetings were conducted on only a weekly basis and only during Plaintiffs' compensable work time, Plaintiffs were not. Rather, GMS required Plaintiffs [to] arrive at least fifteen minutes prior to their scheduled shift start time each day to attend mandatory pre-shift safety meetings." *Id.* (citing Dep. of Fleece at 9:4-10:14, Pls.' Ex. A; Decl. of Opt-in Pls., Pls.' Ex. C)).

5. *See* Dep. of Opt-In Cody Dice at 20, Def.'s Ex. 3 ("Q. So all of the work that you're performing as part of your job, it's basically all underground? After you take the elevator and the man trip, that's when your job duties start? A. Right."); Dep. of Opt-in Gasper Golden at 17, Def.'s Ex. 4 ("Q. Did you have any job duties that you performed above ground? A. No ma'am. Q. Everything was in the mine? A. Yes."); Dep. of Opt-in Ryan Rubeis, Def.'s Ex. 5 at 10-11 ("Can you tell me about your job duties? Once you get in the cage and you go underground, is that when your actual job starts? A. Yeah, pretty much. It pretty much starts once you're dressed . . . . Q. Okay. At any point in the day do you cage up and come back up above ground? A. No. Q. So all of your primary job duties occur underground? A. Yes. Q. Okay. Did you perform any work above ground before you went down for the day? A. No."); Dep. of Opt-in Bryan Hryniewich at 13, Def.'s Ex. 6 ("Q. Did you have any job duties that weren't underground? A. No, ma'am. Q. Everything starts and ends when you cage down and cage up at the end of the day, you're through? A. Yeah."); Dep. of Opt-in William Nixon at 15, Def.'s Ex. 7 ("So everything you're doing as part of your job is down in the mine? A. Mine is strictly underground work. I had nothing to do with above ground work."); Dep. of Opt-in Christopher Glass at 12, Def.'s Ex. 8 ("Q. And all the work that you do is underground? A. Yep."); Dep. of Opt-in Joshua Bolyard at 7, Def.'s Ex. 9 ("Q. Was there any point during your workday where you cage up before your shift is over? A. No. Q. And was there ever any time when anybody at GMS asked you to do any work either before you caged down or after you caged up? A. Not that I recall now."); Dep. of Opt-in Travis Alkire at 9, Def.'s Ex. 10 ("Q. Was there any point during the workday where you came back up above ground? A. No. Q. And did anybody from GMS ever ask you to do any work before you caged down in the morning or after you came up at night or at 4? A. No, not that I know of."); Dep. of Opt-in Jason Anderson at 10, Def.'s Ex. 11 ("Q. And all that work you did for GMS occurs from that time between 4 and midnight after you go underground? A. Yes, ma'am. Q. Did you have any job duties that occurred above ground? A. No, ma'am."); Dep. of Opt-in Caleb Caldwell at 8, Def.'s Ex. 12 ("Q. Did all of your job duties occur underground once you take the man trip to wherever you are in the mine, or was there anything that you did above ground? A. No, I did things above ground.

miners (who were deposed) also varied – crew leader, general laborer, specialty crew, and apprentice, – as did their level of experience (in Pennsylvania, a "red hat" has less than one-year of experience; a "black hat" has more than one year experience).

At some point in 2012, Consol informed GMS that employees of its contractors (*i.e.*, the miners) would have to park in a satellite lot approximately one-quarter mile away from the Portal due to limited space in the main lot near the Mine.[6]  Due to its policy against employees walking to the Portal, Consol further instructed GMS to provide transportation for its employees from and to the satellite parking lot at the beginning and end of the workday.  In complying with this request, GMS first leased and then purchased a ten-passenger van to transport its employees back and forth.  Initially, the van ran from one hour before to fifteen minutes before the start of each

---

Q. What work did you do above ground?  A. We had to get parts ready and things like that to send down.  Q. Okay.  Before your shift, equipment that you need for the day and stuff like that?  A. Mm-hmm.");  Dep. of Opt-in James Conrad at 11, Def.'s Ex. 14 ("Q. Was there ever any point during your shift when you'd cage back up and do anything above ground?  A. Yeah, just once or twice, though.  It was like to go up and get stuff that we needed for below, just certain things you needed to like seal off a wall and things like that.  I can't remember the exact name of the stuff.  I apologize, I was only there for a short time, so I'm trying to remember.");  Dep. of Opt-in Roddrus Clay at 10 ("Q. Was there anything you did as far as performing work before you caged down when you were still up above ground?  A. Yeah. Well, we'd talk and stuff like that, you know, sometimes safety meetings, you know, guys would talk about that, and then check your equipment on you, you know.  That's about it, and then go down there.");  Dep. of Opt-in Christopher Rose at 8, Def.'s Ex. 15 ("Q. Was there ever any time that you performed any work above ground?  A. No.");  Dep. of Opt-in Shane Baker at 10, Def.'s Ex. 16 ("Q. Okay.  During this time period you're up at the portal before you caged down in the morning, were you ever required to do any work above ground before you went down underground at 8:00?  A. To do work above ground?  Q. Right.  A. I mean, the only thing that they required us to do is go get orders, talk to the bosses and see what we were going to do for the day.");  Dep. of Opt-in Danny Eddy at 8, Def.'s Ex. 17 ("Q. Was there any point in your workday when you came back above ground before the end?  A. No.");  Dep. of Opt-in Aaron Huff at 10, Def.'s Ex. 18 ("Is there any point where you get to come up above ground before the end of your shift?  No, we just come up, and then go get changed and wait for the bus driver.");  Dep. of Opt-in Matthew Kulpa at 7, Def.'s Ex. 19 ("Q. Was there any time that you got to come back above ground during the course of your shift?  A. Not that I can remember it, no.  I think maybe we might have one time where our beams went down and we had to go back up and we got sent home, but I don't recall like what time and what day.");  Dep. of Opt-in David Balog at 14, Def.'s Ex. 20 ("Q. I want to go back to your work underground doing long-wall recovery.  Is there any point during the workday when you cage up and come above ground?  A. Never.  Q. Is there any part of your job duties that occur above ground?  A. No.");  Dep. of Opt-in John Douglas Ronto at 10, Def.'s Ex. 21 ("Q. Would I be correct that all the job duties you just described occur underground?  A. Yes.  Q. Are there any job duties that require you to perform work above ground?  A. No.");  Dep. of Opt-in George Andrew Bunic at 10, Def.'s Ex. 22 ("Q. And did all of that work occur underground?  A. Yes.").

6.  Although Plaintiffs concede that their "waiting time" claims are no longer viable, they nevertheless allege (in their brief alone) that the parking and van policies "remain relevant due to the opportunity they created for GMS to conduct mandatory pre-shift safety meetings during the period of April 2012 through April 2014."  *See* Pls.' Br. in Opp. at 11, ECF No. 116.  Plaintiffs do not, however, cite to any record evidence whatsoever to the support this theory.

shift.  About one year later, Gales changed the van's cut-off time to thirty minutes before the start of each shift to ensure that the miners arrived at the Portal with adequate time to prepare for the workday.  GMS did not, however, require its miners to drive to work.  Instead, it allowed them to be dropped off at the Portal or carpool with a Consol employee.

On April 14, 2014, Consol informed GMS that, due to an expansion of the main parking lot, its employees were once again permitted to park near the Portal.  Over the two years that the policy remained in effect, Plaintiffs spent varied amounts of time waiting for the van.  For instance, some miners testified that they waited only "a few minutes" or not at all, while others reported pre-shift wait times of five to ten minutes and post-shift wait times of five to thirty minutes.  The variations in the waiting times depended, in part, on whether the miners elected to shower and change their clothes prior to leaving the worksite at the conclusion of their respective shifts.

### B.  Procedural History

Bonds initiated this case at Civil Action No. 13-1217 on August 23, 2012, on behalf of himself and all others similarly situated, by filing a two-count Complaint in which he alleged that GMS violated the Fair Labor Standards Act ("FLSA"), the Pennsylvania Wage Payment and Collection Act ("WPCA"), and the Pennsylvania Minimum Wage Act ("PMWA").  On October 11, 2013, Bonds filed another Complaint against GMS at Civil Action No. 13-1480 in which he alleged that GMS violated the anti-retaliation provision of the FLSA when it changed his shift just days after his counsel "effectuated service" of the collective action Complaint such that he could no longer care for his adolescent son, which resulted in a "constructive discharge" from his employment.  The Court sua sponte consolidated the two actions on October 16, 2013.  GMS

thereafter filed a Rule 12(b)(6) Motion to Dismiss for Failure to State a Claim and a Rule 12(e) Motion for a More Definite Statement.

In response, Bonds filed an Amended Complaint,[7] alleging that GMS requires its employees – in violation of federal and state wage and hour laws – (1) to arrive at least fifteen or thirty minutes prior to their scheduled shift start time to be transported from the remote on-site parking location to the Portal; (2) to wait at least ten to twenty-five minutes prior to commencing work at the start of each shift; (3) to wait between ten to twenty minutes at the end of each shift for transportation from the Mine entry point back to the parking site; (4) to attend mandatory safety meetings; and (5) to submit to drug/alcohol testing—all of which are allegedly "integral and indispensable to the principal activity of providing underground maintenance and contracting."  Pl.'s Am. Compl., ECF No. 17 at 2.  Plaintiffs have since conceded that the "waiting time" aspect of their claim(s), as well as the drug/alcohol testing component, is not compensable in light of *Integrity Staffing Solutions, Inc. v. Busk*, 135 S. Ct. 513 (2014), which was decided during the pendency of this litigation.[8]

---

7.  The First Amended Complaint, which Plaintiff(s) filed after the consolidation of the two civil actions, does not include the retaliation claim.  It appears that this claim has been abandoned.

8.  The Supreme Court issued its opinion in *Integrity Staffing Solution, Inc. v. Busk* on December 9, 2014, yet Plaintiffs' counsel waited seven months to withdraw their "waiting time" claims (and it is entirely unclear why that delay occurred).  Be that as it may, Plaintiffs now state:

> Plaintiff does not dispute that the Supreme Court's recent decision in *Integrity Staffing Solutions, Inc. v. Busk*, 135 S. Ct. 513 (2014) dramatically changed the landscape regarding the analysis of the compensability of pre-shift and post-shift activities.  Indeed, Plaintiff concedes that the compensability of waiting time, or any pre-shift or post-shift activity, as discussed in this Court's Memorandum Opinion and Order of Court dated January 8, 2014 (Doc. 25, pp. 8-9), has evolved from an inquiry of "whether the time spent waiting is for the benefit of employer or employee" (Doc. 25, p. 8) to a test of whether the  activity "is an intrinsic element" of the principal activities that the employee is employed to perform and "one with which the employee cannot dispense if he is to perform his principal activities."  *Integrity Staffing Solutions, Inc.*, 135 S. Ct. at 517.  That being the case, and based upon *Integrity Staffing* and cases which have followed from lower courts, Plaintiff acknowledges that under the current state of the FLSA, generalized pre-shift and post-shift wait time as well as time spent complying with Defendant's drug testing requirements appears to be non-compensable.  However, nothing under the current state of the FLSA as shaped by these recent court decisions suggests that pre-shift time allocated towards mandatory safety

Before that decision, GMS nevertheless moved to dismiss the Amended Complaint, which the Court later denied.  *See Bonds v. GMS Mine Repair & Maint., Inc.*, No. 2:13-CV-1217, 2014 WL 66413 (W.D. Pa. Jan. 8, 2014).  A motion for conditional certification followed.

On July 1, 2014, the Court conditionally certified a collective action comprised of: "[a]ll current and former non-exempt employees of Defendant, GMS Mine Repair & Maintenance, Inc., who were assigned to work at the Pleasant Grove Portal (entry point) of the Enlow Fork Mine (the 'Enlow Fork Mine Employees') from February 1, 2012 to the present."  *Bonds v. GMS Mine Repair & Maint., Inc.*, No. 2:13-CV-1217, 2014 WL 2957394, at *1 (W.D. Pa. July 1, 2014).  The Court ultimately approved the parties joint proposed notice and consent form, which was disseminated to five-hundred-and-seventy-nine (579) putative collective action members.

On November 6, 2014, Plaintiffs filed one-hundred-and-fifty-seven (157) Opt-in Consent to Join Forms, for a total of one-hundred-and-sixty-one Plaintiffs (Bonds and three others opted-in before conditional certification was granted).  Shortly thereafter, the Court set the parameters of fact discovery: it permitted GMS to serve limited written discovery – a five-part questionnaire answerable without the assistance of counsel – on all named and opt-in Plaintiffs and to select a representative sample of twenty (20) Plaintiffs from whom written and oral discovery could be taken.  *Bonds v. GMS Mine Repair & Maint., Inc.*, No. 2:13-CV-1217, 2014 WL 6682475 (W.D. Pa. Nov. 25, 2014).

During the course of fact discovery, eight (8) opt-ins were voluntarily dismissed, and another thirty-five (35) opt-ins were dismissed after each failed to participate in the written

---

meetings to discuss safety issues and other work related activities is not "an intrinsic element" of the principal activities of underground GMS mine workers who were assigned to work at the Portal during the applicable class period, and thus no longer compensable

*See* Pls.' Br. in Opp. at 4-5, ECF No. 116.  Accordingly, the Court will proceed to analyze only whether the employees are entitled to compensation for their (alleged) mandatory attendance at the pre-shift safety meetings.

discovery process, without any apparent explanation or excuse.  As such, one-hundred-and-eighteen (118) Plaintiffs remain as viable parties in this action.

At present, several motions are pending before the Court: *i.e.*, a motion for class certification, a motion for summary judgment, and a motion for decertification of the conditionally certified collective action.

## II.    Legal Standard

Summary judgment must be granted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The movant must identify those portions of the record which demonstrate the absence of a genuine issue of material fact.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  A material fact is one "that might affect the outcome of the suit under the governing law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  "Factual disputes that are irrelevant or unnecessary will not be counted."  *Id.*

To withstand a motion for summary judgment, the nonmoving party must show a genuine dispute of material fact for trial by citing to particular parts of material in the record.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986).  *See Celotex Corp.*, 477 U.S. at 322 ("[T]he plain language of Rule 56 mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.").  A dispute about a material fact is "genuine" only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson*, 477 U.S. at 248.  "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the

requirement is that there be no genuine issue of material fact." *Id.* at 247–248. *See Matsushita*, 475 U.S. at 586 ("When the moving party has carried its burden under Rule 56[ ], its opponent must do more than simply show that there is some metaphysical doubt as to the material facts."); *see also Podobnik v. U.S. Postal Serv.*, 409 F.3d 584, 594 (3d Cir. 2005) ("To survive summary judgment, a party must present more than just bare assertions, conclusory allegations or suspicions to show the existence of a genuine issue.").

The parties must support their position by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials," Fed. R. Civ. P. 56(c)(1)(A), or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact," Fed. R. Civ. P. 56(c)(1)(B). In reviewing all of the record evidence submitted, the court must draw all reasonable inferences therefrom in the light most favorable to the nonmoving party. *Matsushita*, 475 U.S. at 587.

The court is not permitted to weigh evidence or to make credibility determinations at this stage of the proceedings. *Anderson*, 477 U.S. at 255. Those functions are exclusively for the jury, not the court. *Id.* The court is thus limited to deciding whether there are any disputed issues and, if so, whether they are both genuine and material. *Id.*

## III.   Discussion

At present, the crux of this action is whether the time that the underground mine workers spent attending pre-shift safety meetings is compensable under the FLSA, as amended by the Portal-to-Portal Act of 1947. For the reasons that follow, the Court concludes that the pre-shift safety meetings at issue are noncompensable preliminary activities.

### A.  The FLSA

Congress enacted the FLSA in 1938 "to govern the maintenance of standard hour and wage practices."  *De Asencio v. Tyson Foods, Inc.*, 342 F.3d 301, 305-06 (3d Cir. 2003) ("*De Asencio I*"); *see also De Asencio v. Tyson Foods, Inc.*, 500 F.3d 361, 367-69 (3d Cir. 2007) ("*De Asencio II*").  Under the FLSA, "[n]o employer shall employ any of his employees . . . for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed."  29 U.S.C. § 207(a)(1).  Employers who violate this provision are "'liable to the employee or employees affected in the amount of their unpaid minimum wages, or their unpaid overtime compensation, as the case may be, and in an additional equal amount as liquidated damages.'"  *De Asencio I*, 342 F.3d at 306 (quoting 29 U.S.C. § 216(b)).

The FLSA did not (and still does not) define "work" or "workweek," and the Supreme Court defined the term(s) broadly in early decisions.  *See IBP, Inc. v. Alvarez*, 546 U.S. 21, 25 (2005) (collecting cases).  "It defined 'work' as 'physical or mental exertion (whether burdensome or not) controlled or required by the employer and pursued necessarily and primarily for the benefit of the employer and his business.'"  *Integrity Staffing Solutions, Inc.*, 135 S. Ct. at 516 (quoting *Tennessee Coal, Iron & R. Co. v. Muscoda Local No. 123*, 321 U.S. 590, 598 (1944)).  The Supreme Court also "defined 'the statutory workweek' to 'includ[e] all time during which an employee is necessarily required to be on the employer's premises, on duty or at a prescribed workplace.'"  *Id.* (quoting *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 690-91 (1946)).  "Applying these expansive definitions, the [Supreme] Court found compensable the time spent traveling between mine portals and underground work areas, *Tennessee Coal*, 321

11

U.S. at 598, and the time spent walking from timeclocks to work benches, *Anderson*, 328 U.S. at 691-92." *Id.* Following these decisions, a "dramatic increase" in portal-to-portal lawsuits ensued: "[b]etween July 1, 1946 and January 31, 1947, employees around the country filed 1,913 such actions under the FLSA." *De Asencio I*, 342 F.3d at 306 (citing 93 Cong. Rec. 2,082 (1947)).

### 1. The Portal-to-Portal Act

In response to this flood of litigation, Congress passed the Portal-to-Portal Act of 1947. *Id.* In doing so, "Congress attempted to strike a balance to maintain employees' rights but curb the number of lawsuits." *Id.* "Under the Portal-to-Portal Act, an FLSA action for overtime pay could be maintained by 'one or more employees for and in behalf of himself or themselves and other employees similarly situated.'" *Id.* (quoting 29 U.S.C. § 216(b)). At the same time, "the statute contained an express opt-in provision: 'No employee shall be a party plaintiff to any such action unless he gives his consent in writing to become such a party and such consent is filed in the court in which such action is brought.'" *Id.* (quoting 29 U.S.C. § 216(b)). "Like the original FLSA, however, the Portal-to-Portal Act omits any definition of the term 'work.'" *IBP, Inc.*, 546 U.S. at 26.

The Portal-to-Portal Act nevertheless narrowed the coverage of the FLSA by exempting employers "from liability for future claims based on two categories of work-related activities:"

> (1) walking, riding, or traveling to and from the actual place of performance of the principal activity or activities which such employee is employed to perform, and
>
> (2) activities which are preliminary to or postliminary to said principal activity or activities,
> which occur either prior to the time on any particular workday at which such employee commences, or subsequent to the time on any particular workday at which he ceases, such principal activity or activities.

*Integrity Staffing Solutions, Inc.*, 135 S. Ct. at 517 (quoting 61 Stat. 86-87) (codified at 29 U.S.C. § 254(a)).   Other than these express exceptions, however, the Portal-to-Portal Act did not "purport to change th[e] Court's earlier descriptions of the terms 'work' and 'workweek,' or to define the term 'workday.'"   *IBP, Inc.*, 546 U.S. at 28.

### 2.  Supreme Court Jurisprudence

The Supreme Court first interpreted the term "principal activity or activities" eight years after the enactment of the Portal-to-Portal Act and related regulations.   *See id.* at 29 (citation omitted).   In *Steiner v. Mitchell*, the Court was "confronted with the question [of] whether workers in a battery plant had a statutory right to compensation for the 'time incident to changing clothes at the beginning of the shift and showering at the end, where they must make extensive use of dangerously caustic and toxic materials, and are compelled by circumstances, including vital considerations of health and hygiene, to change clothes and to shower in facilities which state law requires their employers to provide.'"   *Id.* (quoting *Steiner v. Mitchell*, 350 U.S. 247, 248 (1956)).   "After distinguishing 'changing clothes and showering under normal conditions' and stressing the important health and safety risks associated with the production of batteries," the Supreme Court endorsed the Sixth Circuit's conclusion that these activities were compensable under the FLSA.   *Id.* (internal citation omitted).   In reaching this result, the unanimous Court held that "the term 'principal activity or activities' in Section 4 [of the Portal-to-Portal Act] embraces all activities which are an 'integral and indispensable part of the principal activities,' and that the activities in question fall within this category."   *Id.* at 29 (quoting *Steiner*, 350 U.S. at 248).[9]   It therefore concluded that activities "performed either

---

9.  On the same day *Steiner* issued, the Supreme Court decided a slaughterhouse case, *Mitchell v. King Packing Co.*, 350 U.S. 260, 263 (1956), in which "employees of a meat packing company argued that, pursuant to the FLSA, they should be compensated for time spent before or after their shift sharpening their knives."   *Kosakow v. New Rochelle Radiology Associates, P.C.*, 274 F.3d 706, 718 (2d Cir. 2001).   "Because the proper and efficient performance of

before or after the regular work shift, on or off the production line, are compensable under the portal-to-portal provisions of the [FLSA] if those activities are an integral and indispensable part of the principal activities for which covered workmen are employed and are not specifically excluded by Section 4(a)(1)." *Id.* (quoting *Steiner*, 350 U.S. at 256).

More recently, in *IBP, Inc. v. Alvarez*, the Supreme Court "applied *Steiner* to treat as compensable the donning and doffing of protective gear," holding that "'any activity that is "integral and indispensable" to a "principal activity" is itself a "principal activity" under § 254(a)'" of the Portal-to-Portal Act. *Sandifer v. U.S. Steel Corp.*, 134 S. Ct. 870, 876 (2014) (quoting *IBP, Inc.*, 546 U.S. at 30, 37). There, "[t]he Court further held, in response to a question raised only in *Tum* [(the companion case in the consolidated appeal)], that time spent waiting to receive gear before the work shift begins is not compensable, although it emphasized that its analysis would be different if an employer required its employees to arrive at a certain time and then wait to don the gear." *De Asencio II*, 500 F.3d at 368.

This past term, in *Integrity Staffing Solutions, Inc. v. Busk*, the Court revisited the Portal-to-Portal Act's exemption for preliminary to or postliminary activities in deciding whether an employer – a warehouse staffing provider to Amazon.com – must compensate its employees – warehouse workers who retrieved inventory and packaged those products for delivery to Amazon's customers – for the time spent waiting to undergo and undergoing an antitheft security screening before leaving the warehouse each day. *Integrity Staffing Solutions, Inc.*, 135 S. Ct. at 515. "During this screening, employees removed items such as wallets, keys, and belts from their persons and passed through metal detectors." *Id.* In total, such time allegedly "amounted

---

their work required that the knives be 'razor sharp,' the Court held that the sharpening of the knives was 'an integral part of and indispensable to the various butchering activities for which they were principally employed.'" *Id.* (quoting *Mitchell*, 350 U.S. at 262-63). The *Mitchell* Court also "shed light on the meaning of 'integral' (as used in *Steiner*): sharpening knives is both indispensable to the task of butchering animals, and intrinsically 'connected with' it." *Gorman v. Consol. Edison Corp.*, 488 F.3d 586, 591 (2d Cir. 2007) (quoting *Mitchell*, 350 U.S. at 262).

to roughly twenty-five minutes each day" and "could have been reduced to a de minimis amount by adding more security screeners or by staggering the termination of shifts so that employees could flow through the checkpoint more quickly." *Id.*  The district court thus "held that these screenings were not integral and indispensable but instead fell into a noncompensable category of postliminary activities." *Id.* at 516.  The Court of Appeals for the Ninth Circuit reversed that ruling in relevant part, asserting "that postshift activities that would ordinarily be classified as noncompensable postliminary activities are nevertheless compensable as integral and indispensable to an employee's principal activities if those postshift activities are necessary to the principal work performed and done for the benefit of the employer." *Id.* (citation omitted). "Accepting as true the allegation that Integrity Staffing required the security screenings to prevent employee theft, the Court of Appeals concluded that the screenings were 'necessary' to the employees' primary work as warehouse employees and done for Integrity Staffing's benefit." *Id.*

The U.S. Supreme Court reversed. *Id.*  In doing so, the Supreme Court began by noting that "[it] has consistently interpreted the term 'principal activity or activities' to embrace all activities which are an 'integral and indispensable part of the principal activities,'" but elaborated that its "prior opinions used those words in their ordinary sense." *Id.* at 517.  As Justice Thomas explained for the Court:

> The word "integral" means "belonging to or making up an integral whole; constituent, component; *specifically* necessary to the completeness or integrity of the whole; forming an intrinsic portion or element, as distinguished from an adjunct or appendage."  5 Oxford English Dictionary 366 (1933) (OED); *accord* Brief for United States as *Amicus Curiae* 20 (Brief for United States); *see also* Webster's New International Dictionary 1290 (2d ed. 1954) (Webster's Second) ("[e]ssential to completeness; constituent, as a part").  And, when used to describe a duty, "indispensable" means a duty "[t]hat cannot be dispensed with, remitted, set aside, disregarded, or neglected."  5 OED 219; *accord* Brief for United States

19; *see also* Webster's Second 1267 ("[n]ot capable of being dispensed with, set aside, neglected, or pronounced nonobligatory").

*Id.*  "An activity is therefore integral and indispensable to the principal activities that an employee is employed to perform," as the Court explained, "if it is an intrinsic element of those activities and one with which the employee cannot dispense if he is to perform his principal activities."[10]  *Id.*

Applying this standard, the Court held that the security screenings were "noncompensable postliminary activities."[11]  *Id.* at 518.  The Court first highlighted that the "screenings were not the 'principal activity or activities which [the] employee is employed to perform'"—that is, "Integrity Staffing did not employ its workers to undergo security screenings, but to retrieve products from warehouse shelves and package those products for shipment to Amazon customers."  *Id.*  Nor were they "integral and indispensable" to the employees' duties as warehouse workers.  *Id.*  In other words, "[t]he screenings were not an intrinsic element of retrieving products from warehouse shelves or packaging them for shipment.  And Integrity Staffing could have eliminated the screenings altogether without impairing the employees' ability to complete their work."  *Id.*

---

10.  Moreover, as Justice Thomas recounted, the Court's precedents have identified several activities that satisfy this test: "the time battery-plant employees spent showering and changing clothes" in *Steiner* as well as "the time meatpacker employees spent sharpening their knives" in *Mitchell*.  *Integrity Staffing Solutions, Inc. v. Busk*, 135 S. Ct. 513, 518 (2014) (citations omitted).  "By contrast, [it] ha[s] held noncompensable the time poultry-plant employees spent waiting to don protective gear because such waiting was 'two steps removed from the productive activity on the assembly line.'"  *Id.* (quoting *Alvarez, Inc.*, 546 U.S. at 42).

11.  Adopting the position of the Department of Labor, the Solicitor General "agree[d] that these screenings were noncompensable postliminary activities."  *Id.* at 518.  This view was fully consistent with an Opinion Letter issued in 1951 by the Department of Labor, which "found noncompensable a preshift security search of employees in a rocket-powder plant 'for matches, spark producing devices such as cigarette lighters, and other items which have a direct bearing on the safety of the employees,' as well as a postshift security search of the employees done 'for the purpose of preventing theft.'"  *Id.* at 518-19 (citation omitted).  Accordingly, "[t]he Department drew no distinction between the searches conducted for the safety of the employees and those conducted for the purpose of preventing theft—neither were compensable under the Portal-to-Portal Act."  *Id.* at 519.

Importantly, the Court also specifically rejected the view of the Ninth Circuit, which "erred by focusing on whether an employer *required* a particular activity."  *Id.* at 519 (emphasis in original).  Instead, "[t]he integral and indispensable test is tied to the productive work that the employee is *employed to perform*."  *Id.* (emphasis in original) (citations omitted).

> The employer in *Anderson*, for instance, required its employees to walk "from a timeclock near the factory gate to a workstation" so that they could "begin their work," "but it is indisputable that the Portal-to-Portal Act evinces Congress' intent to repudiate *Anderson*'s holding that such walking time was compensable under the FLSA."  *Id.* at 519 (quoting *IBP, Inc.*, 546 U.S. at 41).

And to the Court, "[a] test that turns on whether the activity is for the benefit of the employer is similarly overbroad."  *Id.*

Justice Sotomayor, with whom Justice Kagan joined, "concur[red] in the Court's opinion, and wr[o]te separately only to explain [her] understanding of the standards the Court applies." *Id.* at 519 (Sotomayor, J., concurring).  In her concurrence, Justice Sotomayor agreed with the Court's holdings, but took the view that "an activity is 'indispensable' to another, principal activity only when an employee could not dispense with it without impairing his ability to perform the principal activity safely and effectively."  *Id.* at 520.  According to Justice Sotomayor, that formulation was consistent with Department of Labor regulations and Supreme Court precedent—*i.e.*, the battery plant workers in *Steiner* (who "might, for example, perform his principal activities without donning proper protective gear," but "could not do so safely") and the butchers in *Mitchell* (who "might be able to cut meat without having sharpened his knives, but [ ] could not do so effectively").  *See id.* (citations omitted).  By contrast, Justice Sotomayor did not consider the security screenings of the warehouse workers "integral and indispensable" to their other principal activities in that sense.  As she explained: "[t]he screenings may, as the Ninth Circuit observed below, have been in some way related to the work that the employees

performed in the warehouse, but the employees could skip the screenings altogether without the safety or effectiveness of their principal activities being substantially impaired." *Id.* (internal citation omitted).

### 3. Aftermath of *Integrity Staffing Solutions, Inc.*

Following the Supreme Court's decision in *Integrity Staffing Solutions*, several district courts have applied the "integral and indispensable" standard set forth in that case. *See Dinkel v. MedStar Health, Inc.*, -- F. Supp. 3d --, No. CV 11-998 (CKK), 2015 WL 1735078, at *3 (D.D.C. Apr. 16, 2015); *Jones v. Hoffberger Moving Servs. LLC*, -- F. Supp. 3d --, No. CIV. JKB-13-535, 2015 WL 1321469, at *5 (D. Md. Mar. 24, 2015); *Young v. Beard*, No. 2:11-CV-02491-KJM-AC, 2015 WL 1021278, at *10 (E.D. Cal. Mar. 9, 2015); *Gibbs v. City of New York*, -- F. Supp. 3d --, No. 12–CV–8340 (RA), 2015 WL 321850 (S.D.N.Y. Jan. 23, 2015).   For example, in *Dinkel v. MedStar Health, Inc.*, the United States District Court for the District of Columbia granted a motion for summary judgment on the FLSA claims of hospital workers who were required to adhere to their employer's uniform maintenance policy.[12]  2015 WL 1735078, at *3.   There, the district court rejected the "Plaintiffs' argument based on safety," having deemed the uniform maintenance activities "a far cry from the safety-related precedent

---

12.  In an earlier opinion, the district court outlined the policy, as described by plaintiffs:

> Associates are responsible for maintaining their own uniforms.  Defendants contend that uniforms can be machine-washed at home with other clothing and do not require special treatment. Plaintiffs respond that their uniform maintenance activities include spot cleaning, washing, drying, and ironing their uniforms.  Plaintiffs further claim that because their work exposes them to bacteria and germs that could be transmitted through contact, they regularly wash their uniforms after each use and separately from their ordinary laundry.  Plaintiffs estimate that these activities subsume between one and three hours during a typical week.

*Dinkel v. Medstar Health, Inc.*, 286 F.R.D. 28, 30-31 (D.D.C. 2012); *see also Dinkel v. MedStar Health Inc.*, No. CV 11-998 (CKK), 2015 WL 1735078, at *3 (D.D.C. Apr. 16, 2015) ("Plaintiffs argue that the uniform maintenance activities were integral and indispensable to their work because 'removing infectious pathogens from their uniforms made their jobs safer and more efficient by minimizing the spread of hospital-acquired infections to patients, co-workers and family members, reducing lost productivity due to illness, reducing the cost of replacement workers and mitigating financial losses due to repeat hospital admissions.'").

referenced in *Integrity Staffing Solutions*."   *Id.* at *4.   And in doing so, the court rejected Plaintiffs' argument that "their uniform maintenance activities were important to the hospital's infection control policy," because they [could not] show that their jobs would be so unsafe as to be effectively impossible to carry out their jobs without their uniform maintenance activities." *Id.* As the district court explained, "[m]inimizing infection—even accepting Plaintiffs' experts' testimony regarding the importance of infection control—does not reach the level of importance to Plaintiffs' principal activities as the showering and changing of the battery-plant employees." *Id.*

### 4. GMS Mine Repair & Maintenance Inc.'s Pre-Shift Safety Meetings

Here, the pre-shift safety meetings at issue are noncompensable preliminary activities. As an initial matter, the meetings do not qualify as principal activities in their own right.   GMS did not employ Plaintiffs to attend these meetings or otherwise conduct any pre-shift activities, but to perform underground labor related to its contracted mining operations – constructing (ventilation) walls, building track, masonry, spraying walls, gopher drilling, longwall set up/recovery, etc. – as well as the above-ground activities (such as readying parts and resupplying) which were actually necessary to conduct and complete that work.

Nor were the pre-shift safety meetings "integral and indispensable" to those principal activities.   Attendance at a pre-shift safety meeting (while perhaps desirable) is not an intrinsic element of conducting underground mining activities.   It is instead the sort of activity that is "two steps removed" from the productive activity that, in this case, occurs underground.   GMS also could have eliminated the pre-shift safety meetings altogether without impairing the miners ability to conduct their work.   In other words, the miners are able to perform underground labor regardless of whether they attended the pre-shift meetings.   To be sure, the Supreme Court's

"sole reference to safety does not suggest that safety is a key indicator of whether an activity is 'integral and indispensable.'"  *Dinkel*, 2015 WL 1735078, at *3.  "To the contrary, the Supreme Court's reference to safety is in the context of explaining how the Court's decision is consistent with the position that there is 'no distinction between the searches conducted for the safety of the employees and those conducted for the purpose of preventing theft,' neither of which 'were compensable under the Portal–to–Portal Act.'"  *Id.* (quoting *Integrity Staffing Solutions*, 135 S. Ct. at 519); *see also* Def.'s Reply at 4, ECF No. 120 ("The *Integrity Staffing* Court underscored that a preliminary activity that serves a safety purpose is no more necessary to, or an integral part of, the employee's principal activity solely by virtue of the *reason* the activity is performed.") (emphasis in original).

For their part, Plaintiffs brush aside this sort of analysis and instead focus on Justice Sotomayor's reference to *Steiner* and inclusion of safety in her (re)-formulation of what constitutes an "indispensable" activity.  To that end, Plaintiffs state:

> Similar to the employees in *Steiner v. Mitchell*, the GMS mine workers who comprise the Class Members in the matter at hand were required to attend pre-shift safety meetings prior to the start of their paid shift which were clearly *integral* in the employees' ability to safely and effectively perform their jobs. While GMS attempts to characterize the pre-shift safety meetings as "informal pre-shift conversations" which "generally lasted no more than five to ten minutes," overwhelming evidence exists that these meetings were formal and mandatory, and that they started fifteen minutes prior to shift start.

Pls.' Br. in Opp. at 6, ECF No. 115 (emphasis added).  This position misses the mark: "[a]n activity must be *both* integral *and* indispensable to be a compensable activity under the FLSA," *Dinkel*, 2015 WL 1735078, at *3 (emphasis in original), and these concepts are analytically distinct, *Perez v. City of New York*, No. 12 CIV. 4914 SAS, 2015 WL 424394, at *1 (S.D.N.Y. Jan. 15, 2015).  So, too, have Plaintiffs wrongly focused on the mandatory nature of the alleged meetings.  As the Supreme Court made clear: "[i]f the test could be satisfied merely by the fact

20

that an employer required an activity, it would sweep into 'principal activities' the very activities that the Portal-to-Portal Act was designed to address." *Integrity Staffing Solutions, Inc.*, 135 S. Ct. at 519.  Finally, Plaintiffs' reliance on *Steiner* is misplaced.  Unlike those activities that satisfy the test of the Supreme Court – for example, "the time battery-plant employees spent showering and changing clothes because the chemicals in the plant were 'toxic to human beings'" – Plaintiffs have not offered any evidence that the fifteen-minute pre-shift safety meetings are necessary for them to enter the Mine and perform their principal job duties.

Because the pre-shift safety meetings are neither principal activities nor integral and indispensable to said principal activities, the Court concludes that they are not compensable under the FLSA.  Accordingly, the Court will grant the motion for summary judgment of Defendant GMS on Plaintiffs' FLSA claim.

### B.  PWPCL & PMWA

The parties do not dispute that the PWPCL and PWPA are interpreted coextensively with the FLSA.  Although accurate in some circumstances, *see, e.g.*, *Jochim v. Jean Madeline Educ. Ctr. of Cosmetology, Inc.*, No. CIV.A. 13-6564, 2015 WL 1565827, at *5 (E.D. Pa. Apr. 8, 2015) (discussing whether a plaintiff constituted an "employee" within the meaning of the FLSA and PMWA), "[t]he Pennsylvania General Assembly has not in any way adopted the federal Portal to Portal Act," *Caiarelli v. Sears, Roebuck & Co.*, 46 A.3d 643, 648 (2012) ("McCaffery, J., dissenting from the dismissal of an appeal as having been improvidently granted).  Perhaps aware of this substantive difference in the applicable law, Defendant GMS asks this Court, in the alternative, to decline to exercise supplemental jurisdiction over the PWPCL and PMWA claims.

Under 28 U.S.C. § 1367, "[d]istrict courts may decline to exercise supplemental jurisdiction where: (1) the claim raises a novel or complex issue of State law, (2) the claim

substantially predominates over the claim or claims over which the district court has original jurisdiction, (3) the district court has dismissed all claims over which it has original jurisdiction, or (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction." *De Asencio,* 342 F.3d at 309 (citing 28 U.S.C. § 1367(c)(1)-(4)).   Here, for instance, the remaining claims raise novel issues of state law, *see Caiarelli*, 46 A.3d at 645; and the Court will enter summary judgment on the FLSA claim over which it has original jurisdiction.  *See also Lopez v. Tri-State Drywall, Inc.*, 861 F. Supp. 2d 533, 538 (E.D. Pa. 2012) ("[T]he Third Circuit has expressed serious reservations about the exercise of supplemental jurisdiction over WPCL claims.") (citing *De Asencio*, 342 F.3d at 301).   Based on these considerations, the Court declines to exercise supplemental jurisdiction over the remaining state law claims in this action.

## IV.     Conclusion

For the reasons hereinabove set forth, the Court will grant in part and deny in part the motion for summary judgment of GMS and decline to exercise supplemental jurisdiction over Count Two of the First Amended Complaint; deny its motion for decertification of the conditionally certified collective action; and deny Plaintiffs' motion for class certification pursuant to Federal Rule of Civil Procedure 23.  An appropriate Order follows.


McVerry, S.J.

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **JOSEPH A. BONDS**, *individually and on behalf of all others similarly situated*, | ) ) ) |
| **Plaintiffs,** | ) **2:13-cv-1217** ) **(Lead Action)** |
| **v.** | ) ) |
| **GMS MINE REPAIR & MAINTENANCE, INC.,** | ) ) ) |
| **Defendant.** | ) ) |

## ORDER OF COURT

AND NOW, this 23rd day of September, 2015, in accordance with the foregoing Memorandum Opinion, it is hereby **ORDERED**, **ADJUDGED** and **DECREED** as follows: (1) the MOTION FOR CLASS CERTIFICATION PURSUANT TO FED. R. CIV. P. 23 (ECF No. 99) filed by Plaintiff Joseph A. Bonds, individually and on behalf of all other similarly situated is **DENIED**; (2) the MOTION FOR SUMMARY JUDGMENT (ECF No. 102) filed by Defendant GMS Mine Repair and Maintenance, Inc. ("GMS") is **GRANTED** as to Count One of the First Amended Complaint and **DENIED** as to Count Two of the First Amended Complaint; and (3) the MOTION FOR DECERTIFICATION OF CONDITIONALLY CERTIFIED COLLECTIVE ACTION (ECF No. 106) filed by GMS is **DENIED**.

The Clerk shall docket the herein lead and consolidated actions **CLOSED**.

BY THE COURT:

s/Terrence F. McVerry
Senior United States District Judge

cc:    **Derrek W. Cummings**
Email: dcummings@mwcfirm.com
**Larry A. Weisberg**
Email: lweisberg@mwcfirm.com

**Avrum Levicoff**
Email: alevicoff@lsandd.net
**Sunshine R. Fellows**
Email: Sfellows@LevicoffLaw.com